SHELLA DEEN (SBN 149735)
shella.deen@hogefenton.com
HOGE, FENTON, JONES & APPEL, INC.
60 South Market Street, Suite 1400
San Jose, California 95113
Telephone:  (408) 287-9510
Facsimile:  (408) 287-2583

NANCY L. McCULLOUGH (SBN 164169)
nancy@mcculloughlawoffices.com
LAW OFFICES OF NANCY L. McCULLOUGH
10250 Constellation Avenue, Suite 100
Los Angeles, CA  90048
Telephone:  (323) 931-0267
Facsimile:  (323) 931-0268

**Attorneys for Plaintiff**
**BRUCE THOMAS VEST III**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE THOMAS VEST III, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SYMMETRIC LABS, INC., a Delaware corporation, and ALEXANDER GREEN, an individual.<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br>**(1) Correction of Patent Inventorship;**<br>**(2) Declaratory Judgment (Patent Ownership);**<br>**(3) Declaratory Judgment (Other Intellectual Property Materials);**<br>**(4) Fraud (Promissory Fraud);**<br>**(5) Fraud and Fraudulent Concealment (Intentional Suppression of Known Facts);**<br>**(6) Fraud (Intentional Non-Disclosure of Material Facts by a Fiduciary)**<br>**(7) Constructive Fraud (Obtaining Advantage by Breach of Duty);**<br>**(8) Negligent Misrepresentation;**<br>**(9) Breach of Fiduciary Duty;**<br>**(10) Breach of Contract; and**<br>**(11) Breach of Covenant of Good Faith and Fair Dealing**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Bruce Thomas Vest ("Plaintiff" or "Vest") and files this Complaint and Demand for Jury Trial against Defendants Symmetric Labs, Inc. ( "Company" or "Symmetric Labs") and its co-founder, President, and initial investor, Defendant Alexander Green ("Defendant" or "Green"), (collectively, the "Defendants"), as follows:

## NATURE OF THIS ACTION

1.      Plaintiff Vest, an experienced mechanical and electronic engineer, was the co-founder, mechanical architecture developer, software development team leader, as well as an officer and founding board director of the San Francisco-based technology start-up Company.

2.      Plaintiff made a number of contributions to the Company, including the design of an efficient operating model of the Company's core commercial offering and a lighting installation product ("Lighting Product") that has generated millions in revenue for the Company. The Lighting Product has been used in large stage shows, festivals (including for prominent musical artists), large-scale corporate events such as feature film premieres, and as commissioned stand-alone artistic displays.

3.      In addition to the mechanical design of the Lighting Product, using his engineering and electronics design proficiency, Plaintiff also created a "mapping" feature to simplify the installation and enhance the operational performance of the Lighting Product.  As such, Plaintiff was identified as an inventor on the provisional patent application filed by the Company for this "mapping" feature. However, without any notice or justification, the Company unilaterally removed Plaintiff's name as an inventor on the non-provisional patent application that followed. The Company has failed and refused to correct this blatant omission, despite Plaintiff's repeated requests therefor.

4.      In this lawsuit, Plaintiff seeks to correct the omitted inventorship from the patent at issue by identifying him as an inventor, and seeks damages, declaratory, and other relief for the Company's willful and continuous failure to afford Plaintiff a long-promised memorialization of his co-founder's equity share in the Company. Plaintiff also seeks payment, commensurate with his share, as well as pay other unpaid amounts promised to him by Defendants, including unpaid revenues and product assets.

1
2
3                            **THE PARTIES**

4        5.        Plaintiff Vest is an individual, residing, and at all times relevant to the allegations

5   in this Complaint in the Northern District of California, at 827 Guerrero Street, San Francisco, CA

6   94110. Plaintiff was a founding shareholder, member of the Company's initial Board of Directors,

7   and held various Company officer positions, including Chief Technology Officer, Vice President,

8   and Secretary.

9        6.        On information and belief, Defendant Symmetric Labs, Inc., is a Delaware

10  corporation, conducting business under the name Symmetry Labs.  At all times relevant to the

11  allegations of this Complaint, Symmetric Labs maintained a principal place of business in the

12  Northern District of California, either at 275 Eighth Street, Third Floor, San Francisco, California

13  94103-3924, or at 2255 Mission Street, San Francisco, California  94111-1811.

14       7.        On information and belief, at all times relevant to the allegations of this Complaint,

15  Defendant Alexander Green, an individual, who previously resided in the Northern District of

16  California and also maintained residences in the Western District of New York (at address(es)

17  unknown to Vest).  On information and belief, Defendant Alexander Green is presently

18  incarcerated in a Federal prison facility (and identified there as Inmate Register No. 19658-111),

19  with an address of FCI Sheridan, 27072 Ballston Road, Sheridan, OR 97378.  Defendant Green is,

20  and at all relevant times was, a founding shareholder (along with Plaintiff Vest and others who are

21  not parties to this Complaint), served on the Company's Board of Directors as its President, held

22  various other management team members roles, both formally and informally, and was an initial

23  investor in the Company.

24       8.        On information and belief, Plaintiff alleges that at all times herein mentioned,

25  Defendants, and each of them, were the principals, agents, and/or co-conspirators of each of the

26  other Defendants, and in doing the things herein described, were acting in the course and scope of

27  such agency and/or conspiracy with the knowledge, permission and/or consent of the other

28  Defendants.

1
2
3

**JURISDICTION AND VENUE**

4        9.        This Court has original subject matter jurisdiction in this action under 28 U.S.C. §§

5    1331, 1338 (a)-(b), and 2201, and under 35 U.S.C. § 1 et. seq., including §256, because this action

6    arises under the patent laws of the United States, in seeking correction of patent inventorship and

7    other relief provided for therein.

8        10.       This action further arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-

9    2202, because this action seeks, *inter alia*, a declaration of patent inventorship, and damages and

10   injunctive relief related to omission of a patent inventor.

11       11.       This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a) (1) because the

12   matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000),

13   exclusive of interest and costs, and arises between parties, who are citizens of different states.

14       12.       This Court has supplemental jurisdiction over pendant claims asserted herein that

15   arise under the laws of the State of California, including fraud (Cal. Civ. Code §§ 1572, *et. seq.*),

16   fraudulent concealment (Cal. Civ. Code § 1710(3)), and breach of contract (Cal. Civ. Code §

17   3300). The Federal claims and the California state law claims in this action form part of the same

18   case or controversy and/or are substantially related to the patent claims such they form part of the

19   same case or controversy.

20       13.       Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391 *et.*

21   *seq.*, and 1400(b), because Defendants' business activities in the State of California subject them to

22   personal jurisdiction in such state, and because a substantial portion of the events and omission

23   underlying the allegations in this action occurred in the Northern District of California.

24                                   **GENERAL ALLEGATIONS**

25       14.       Vest and Green first met in August 2011. A friendship developed, anchored by

26   their mutual interest in integrating technology with the creative arts, particularly music.

27       15.       Prior to meeting Green, Vest's experience in designing consumer

28   products, combined with his appreciation of dance and art, prompted him in May 2012 to

4

**COMPLAINT**

begin development of wearable technology products programmed to respond to people's movements in synchronization with animated light. Vest developed prototypes and variants between June 2012 and October 2013 to explore how to further accentuate dance movement and inspire new styles of dance with the technology and shared his in-development wearable technology ideas and sketches with Green from time to time, who expressed great interest.

16.     In mid-2012, Green began discussing the preliminary vision for an interactive LED installation for Burning Man 2012 with people in the Burning Man community and started searching for people who could refine the idea and had the technical skills to build it. Those who were interested met to further refine the vision, during which time the skills necessary for the project to succeed were determined, and by July 2012, a core team was formed including those having the needed skills.

17.     Software engineers Jenny Finkle and Mark Slee, who had built several LED installations previously, started investigating the best technology for the lighting software to control the LEDs. Electrical engineer John Stockdale joined to design the power and data systems that connect the software to the lights. Vest joined the core team to take the initial idea and design the physical form and structure to display the LEDs in the most engaging way for viewers.

18.     Between July and August 2012, the core team and a team of volunteers developed the first version of the LED light installation, known as the "Sugar Cubes". Green provided funds for the project, and acted primarily as project manager, which included tasks such as finding a workshop to build in, purchasing food for the volunteers, and searching for other experts who could help with the project.  Vest, as the project mechanical design and fabrication team leader, participated in discussions with the entire team to develop an overall artistic vision.

19.     Vest took the team's initial idea of a solid, opaque metal cube, which blocked much of the light being emitted, and built a series of open frame-work prototypes to provide more lights to be seen, and therefore yield many more options for artistic design and customization. The prototypes demonstrated that a hollow cube design, with LEDs on the edges and translucent sides, resulted in a substantially richer visual canvas for the software, and therefore a more expressive

show for viewers. Additionally Vest completed the mechanical engineering to ensure the structural safety of the project.

**Early Company Development History; "Sugar Cubes" Product Launch**

20.      Green and Vest demonstrated the early "Sugar Cubes" design at the August 2012 "Burning Man" festival.  The project's successful reception there encouraged both to further develop the LED designs, which became the forerunners of the Company's current commercial projects.  This early success led Green and Vest to discuss how they might collaboratively operate a company to develop and market both the "Sugar Cubes" and other technology projects, and many discussions and meetings to advance this mutual intent were held.

21.      Throughout 2012, Vest devised updates to the initial "Sugar Cube" structure for showing at additional public events, including improved electrical systems and an improved mapping software. The mapping improvements enabled the "Sugar Cubes" to display volumetric animations, allowing the LEDs to produce 3D shapes that move across and through the structure. Vest and Green recorded a video to celebrate the completion of mapping as an important milestone in making the "Sugar Cubes" more compelling.  Vest secured the "Sugar Cubes" first public activation with a fully-mapped software at "San Francisco Decompression", an arts event that took place in San Francisco on Oct. 7, 2012.

22.      Throughout 2013, Vest built a second version of his wearable technology to control the early "Sugar Cubes" design, and arranged for a public demonstration of this functional model as part of his Artist in Residence at Autodesk, Inc. on October 3, 2013. The functioning demonstration resulted in Vest obtaining several paid activations for the wearables technology, and sparked conversations between himself and Green of the wearable technology's potential as a product, and the potential value to enhance the "Sugar Cubes" experience with crowd and performer interactivity.

23.      2013-2015 was busy with further project design efforts and increasing visibility by the Company's accepting of key events.  In September 2013, Green secured a high-profile public event for the "Sugar Cubes" as the main stage attraction of the "Global Citizens Gala" at New

York's Paramount Hotel.  Vest designed the stage layout for the installation of the "Sugar Cubes", and led a production team to install the "Sugar Cubes" for the highly acclaimed event.

24.     By the fourth quarter 2014, Vest had written a fully-functioning software framework and constructed multiple units of varying form factors for his wearable technology products, and felt by then that he could work on a more structured, formal basis with Green to further the LED fixture product development.  Green and Vest were enthused by the prospect of working together. Green also expressed great interest in Mr. Vest's further developing his wearable technology ideas into other Company products.

25.     In early 2013, Mr. Vest developed a relationship with Audiowaska Productions while working on the "Sugar Cubes" at the NIMBY workshop. The relationship lead to the first inclusion of a "Sugar Cubes" installation at a music festival production, indicating optimistic prospects for future such exploitations, at the April 5-8, 2012 "Lucidity Festival", held in Santa Barbara, California.

26.     In May 2013, an auto collision following a "Sugar Cubes" public event in Belden, California rendered the first "Sugar Cubes" structure damaged and unusable.  Vest and Green met in or about June 2013 to discuss this, and Vest ultimately re-designed the mechanical architecture for the "Sugar Cubes".  Green managed the software engineers and fabrication team that recreated Mr. Vest's newly-redesigned architecture.  This joint effort resulting in a new working model of the "Sugar Cubes", which was then featured at the 2013 "Burning Man" festival (Aug. 26 through Sept. 2, 2013).

**Development and Prosecution of Auto-Mapping Technology Patent**

27.     Vest's undergraduate (MIT) and Master's (Stanford) degrees provided him with a context to envision the techniques that would enable developing a camera and computer vision software to identify and determine the location of objects without the need for human input – the core of the "auto-mapping" functionality that is the subject of the disputed patents in this action.

28.     During 2012, shortly after the first public showing of the "Sugar Cubes" at the 2012 "Burning Man" Vest developed an approach to "mapping" cubes more efficiently in three dimensions, building on the existing "Sugar Cube" software, by reducing both:  (a) the costs of

human capital resources previously needed to manually inspect each cube, and (b) the time

necessary to install, activate and trouble-shoot a "Sugar Cubes" installation.

**Formation of a Corporate Entity to Formalize Project Design Team and Mission**

29.     Green formed a Delaware LLC, known as Symmetria LLC, in or about October

2013, to formalize the working relationships of the team members.

30.     In or about October 2014, another Delaware LLC, known as Symmetric Labs,

LLC, was formed by Green.  Other team members were identified and recruited to join the

developing company.

31.     In July 2015, a Delaware corporation, Symmetric Labs, Inc., was formed to replace

Symmetric Labs, LLC, with Vest serving on the Board of Directors and holding the office of Vice

President.  This entity remains the operative structure for the Company at present, to the best of

Plaintiff's knowledge. Upon the latter corporation's July 2015 formation, three (3) directors were

named:   Green, Vest, and Ash Kalb, a New York lawyer with early stage technology company

development experience.

**Plaintiff's Lead Efforts in Exploring Patent Protection for the Company's Products**

32.      Prior to Kyle Fleming's joining the company as lead software engineer, Vest

contacted patent agent Peter Miller on March 30, 2015 to begin developing the Company's patent

portfolio. This led to a further meeting between Green, Vest and Mr. Miller on April 6, 2015 to

refine the Company's patent strategy, leading to application for patent registration for the auto-

mapping methodology, culminating in Mr. Miller's preparing priority provisional patent

applications for it, USPTO Nos. 62/424,523 and 62/301,581.

33.     The method described using a camera with computer vision software to

automatically configure any layout of LED fixtures, not limited to only Cubes.

34.     In or around April 2014, Green met software engineer Kyle Fleming, who was in

the initial stages of developing a prototype auto-mapping system for the LED installation called

Squared. Recognizing the synergy that this would provide to the "Sugar Cubes" auto-mapping that

Vest was proposing, Green and Vest discussed adding Mr. Fleming to their "Sugar Cubes"

software team.  This meeting led to an offer for Mr. Fleming to join the Company as co-founder to

build out a new software framework for Symmetry's LED systems, including the development of the auto-mapping software.

35.     During Mr. Fleming's efforts to refine the auto-mapping software throughout 2015, Mr. Fleming and Vest met to discuss the design and implementation of the auto-mapping process that resulted in Claims 1, 11, 12, 19, 20 on the Company's provisional patent applications Nos. 2/424,523 and 62/301,581, which were eventually combined to form the disputed non-provisional US Patent Application No. 15/445,911.

36.     After initial development on the auto-mapping software, Mr. Miller scheduled an additional development session with the team on Dec. 14, 2015. During this time, Vest updated a "Folding Cube" design (a refinement of the original "Sugar Cube") and oversaw the manufacturing of more units to enable larger contracts.

**Plaintiff's Devotion of Full-Time Efforts to the Company**

37.     By early 2015, Vest had re-arranged his prior work commitments for third parties in order to give the Company an enhanced commitment, from three (3) days per week to five (5) or more days per week, with Vest working primarily from the Company's San Francisco workspace.  He continued to work devotedly toward developing the Company until early 2017, when he departed, in frustration over Green's repeated failure to uphold various promises and agreements he had made to Vest, most significantly that of meaningfully discussing and memorializing their founder equity compensation terms, despite Vest's repeated requests therefor.

**Development of Initial Company "Founders"**

38.     Green and Vest considered themselves as sole co-founders of the Company from 2014 onward, then thereafter considered Mr. Fleming and Mr. Morrow to be additional co-founders.  As agreed-upon by this four-person management team in 2015, Vest led physical product development and managed the customer interfacing duties regarding installation design, while Mr. Morrow handled its finances and participated in software development, Mr. Green took the primary lead role in securing investors and finding customers, and Mr. Fleming assumed the lead software engineer role.

**Departure of Initial COO Prompts More Serious Talks of Founders' Equity Share Allocations**

39.     Mr. Morrow left the Company in Jan. 2016, stating that he had no expectation of retaining significant equity participation in the Company, requesting an adviser's share of approximately one percent (1%).

40.     Mr. Morrow's departure prompted several focused and lengthy conversations regarding formalizing founders' governing documents, to set forth relative shares of equity for the then-remaining three co-founders (i.e., Green, Vest, and Mr. Fleming), which document Mr. Kalb was tasked with preparing.  This document was never prepared to Vest's knowledge.

41.     Fleming left the Company in June 2016, prompting multiple additional conversations between Vest and Green to formalize founders' documents and relative shares of equity.   Vest ceased working primarily for the Company in Jan. 2017, believing by then that Green would put off the formal documents indefinitely, so long as Mr. Vest continued working diligently for the Company without these in place.

**Unpaid Monthly Compensation Withheld from Plaintiff**

42.     Vest also repeatedly emphasized, before and during his time working with the Company, to Green that he could not devote his full-time services to the Company solely for deferred compensation, but would instead also expect the Company to pay him a reasonable monthly salary, to which Green agreed, yet only honored on a sporadic basis.

43.     To date, Mr. Vest has not been compensated for seven (7) months of his services, including for the periods of July through Dec. 2015, the primary product development stage for the existing "Sugar Cubes" product, and Nov. through Jan. 2017 for the wearables product development, creating financial hardships for him, as he repeatedly informed other Company principals.

44.     As early as October 2014, Green promised to prepare a co-founders' equity arrangement before the end of 2014, yet failed from then until the present.

45.     Throughout the Company's history, both Vest and Green shared the co-founding tasks of identifying new team members and potential investors.  As new team members joined and

departed the Company, Vest often assumed diverse management duties for the Company, including payroll responsibilities, managing contractor and vendor relationships, setting and vetting strategy with Green, while expressing increasing levels of concern about the as-yet-unsettled founders' equity arrangements.

**Insufficiency of Employment Terms Document Proffered to Plaintiff**

46.     To date, the only proposed documentation of employment terms between the Company and Vest were prepared in September 2015, after more than a year's work and compensation discussions, consisting of an employment offer letter prepared by Mr. Kalb (the "Offer Letter").  The Offer Letter did not mention his founder equity participation at all, and made broad assignments of all Mr. Vest's IP interests to the Company.  These points were inconsistent with Mr. Vest's discussions and understandings to date with co-founder Green.

47.     The Offer Letter contemplated only an at-will employer relationship between Vest and the Company, requested assignment of all IP developed by Mr. Vest to the Company, created a reporting structure (rather than a co-management structure) between Vest and Green, and offered a typical employee's stock option plan, rather than a co-founders' equity share.  Vest was concerned by the disconnect between his expectations and the Offer Letter, and declined to sign it for this reason, as did both Mr. Morrow and Mr. Fleming

48.     Over several months following the Offer Letter's presentation, until Vest ultimately ceased working for the Company in frustration over this and other concerns in January 2017, Green provided a variety of implausible explanations and empty reassurances for why Vest should sign the Offer Letter.

**Breakdown of Trust and Communication Between Plaintiff and Defendant Green**

49.     Amid these diverse excuses, Vest trustingly continued to advance the Company's development for nearly two and one-half years, despite his misgivings about Green's increasing conflicts with Company clients, as well as his unfulfilled promises to himself.

50.     By mid-Nov. 2016, Mr. Vest was considering the unhappy realization that his trust in Green had been so significantly eroded, future effective collaboration might no longer be possible.  As a result, he undertook to set more specific working boundaries with Green, limiting

**COMPLAINT**

his presence at the Company's office.  Eventually, Mr. Vest began working on projects from his home to further this, in particular fulfilling the Company's commitments to technology client The Go Game.

51.     Throughout the period of Nov. 2016 through Jan. 2017, Vest continued supporting Company functions.

52.     After discussions with Company advisors, Green and Vest began to discuss parameters for their ongoing business relationship, in mid-Dec. 2016. These discussions effectively ended as Green failed to provide draft agreements on timelines promised and responded with offers increasingly lower than original understandings from in-person discussions.

**Discovery of Plaintiff's Omission from Non-Provisional Patent; Despite Plaintiff's Contributions to a Majority of Claims, as Acknowledged on the Provisional Patent**

53.     In the course of efforts throughout 2017 to informally resolve his differences with the Company, Vest discovered, in July 2017, that his name was omitted from the non-provisional auto-mapping patent, as filed by the Company, nearly 5 months earlier, without notice.  This omission took place even despite Vest being a named inventor on seven of the ten claims in the provisional patent application filed by Mr. Miller on Feb 29, 2016 in conjunction with the latter's discussions Vest and the other Company inventors – which claims were repeated nearly verbatim in the non-provisional patent application.

54.     Green refused, and continues to refuse, to direct an amendment to the then-pending non-provisional patent application to correctly include Vest as an inventor.

55.     Vest trustingly and willingly undertook these significant contributions in a dedicated manner from the Company's inception and continuing for several years, while the Company reneged on its promises to recognize and compensate him as both a founder and inventor or co-inventor of its key technology portfolio.

56.      By this lawsuit, Vest seeks adjudication of his right to receive the status and compensation promised, yet reneged upon, by the Defendants.

**AN ACTUAL, JUSTICIABLE CONTROVERSY EXISTS**

**BETWEEN THE PARTIES TO THIS ACTION**

57.     Plaintiff has attempted to recover his unpaid and co-founders' status, restore his name as an inventor that the Company, and seek redress for Defendants actions.

58.     The Company has also failed to confirm that Vest retains sole ownership and control of the wearable technology enhancements for the "Sugar Cubes" that he created. Therefore, the unresolved and disputed rights, as aforesaid, form an actual and justiciable controversy between the parties.

**FIRST CAUSE OF ACTION**
**Correction of Patent Inventorship**
**(35 U.S.C. § 256)**
**(Against All Defendants)**

59.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 58, inclusive, as if fully set forth herein.

60.     As detailed above, Plaintiff Vest collaborated with the listed inventors and contributed to the conception of the claimed inventions of the 9,942,970 patent, the 10,237,957 patent, and U. S. patent application number 16/267,341  and any patent application dependent therefrom and/or claiming priority to the disputed patents (collectively, the "Patents").

61.     Plaintiff Vest was not named as a co-inventor on any of the Patents through the Company's error, without any deceptive intent on the part of Plaintiff Vest.

62.     Pursuant to 35 U.S.C. § 256, Plaintiff Vest who contributed to the conception of the inventions claimed in the Patents should be named as a co-inventor on all of the Patents.

63.     This Court should correct the Company's error of omitting Plaintiff Vest from the Patents by issuing an Order to the Director of the United States Patent and Trademark Office directing the Director to correct the inventorship of the Patents.

**SECOND CAUSE OF ACTION**
**Declaratory Judgment (Patent Ownership)**
**(28 U.S.C. §§2201-2202)**
**(Against All Defendants)**

64.     Plaintiff Vest realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 63, inclusive, as if fully set forth herein.

65.     A patent "applicant" under 37 C.F.R. 1.42 is an inventor or a person applying for a patent as provided in 37 C.F.R. §§ 1.43, 1.45. or 1.46.  Of these sections, 37 C.F.R. § 1.46 provides, in relevant part, that "a person to whom the inventor has assigned or is under obligation to assign the invention may make an application for patent."  Because Plaintiff Vest is an inventor of the disputed inventorship patents and has not assigned, nor is under an obligation to assign, his interest in the Patents, he is a joint owner of the Patents.

66.     Vest and Company have a justiciable controversy regarding their respective rights under the Patents. These patents currently do not identify Vest as an inventor, despite the fact that he was an inventor of the Patents and there exists an immediate and real dispute between Vest and the Defendants, regarding Vest's status as an inventor of the Patents

67.     As a joint owner of the Patents, Plaintiff Vest has the right to participate in the prosecution of the Patents. Because Plaintiff Vest has been deprived of the opportunity to participate in the prosecution of the Patents, he has been deprived of the opportunity to draft and amend the claims of the Patents and, as such, has been deprived of the opportunity of deriving value from this process.

68.     As a joint owner of the Patents, Plaintiff Vest has the freedom to practice seeks a Declaratory Judgment that the inventions claimed therein to make, use, sell, import, or otherwise provide goods and services related thereto.

69.     Plaintiff Vest is therefore entitled to a Declaratory Judgment that Plaintiff Vest is a joint owner of the Patents.

70.     Plaintiff Vest further seeks a Declaratory Judgment that, as a joint owner of Disputed Inventorship Patents, Plaintiff Vest has the right to participate in the prosecution of the Disputed Inventorship Patents.

71.     Plaintiff Vest further seeks a Declaratory Judgment that he has an absolute right to make, use, sell, import, or otherwise provide goods and services related to the Patents, without limitation.

72.     Vest seeks a Declaratory Judgment that Vest is an inventor of the Patents and is entitled to the rights that accompany that inventorship.

### THIRD CAUSE OF ACTION
**Declaratory Judgment (Ownership of Other Rights)**
**(28 U.S.C. §§2201-2202; 17 U.S.C. § 101, et. seq.)**
**(Against All Defendants)**

73.     Plaintiff Vest realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 72, inclusive, as if fully set forth herein.

74.     In the course of developing the "Sugar Cube" products, Plaintiff Vest also created and designed wearable technology products for purpose of integrating these products into the "Sugar Cubes"; this included hardware, software, and operational components.

75.     Upon information and belief, the Company ultimately decided that it would not further develop the wearable technology functionality for the "Sugar Cubes", leaving undetermined whether the Company has developed any protectable intellectual property interests in the same. Therefore, Plaintiff seeks a declaration that all materials relating to "Sugar Cubes" wearable technology development phase, including product refinements, inventions, workbooks, prototypes, and any other protectable interests, as provided for in the U.S. Copyright Act, and otherwise, belong solely to Plaintiff, free of any royalty payment or other compensation obligations to the Company, in perpetuity, and with no obligation to refrain from using the same in connection with other event lighting projects.

76.     Plaintiff Vest also seeks a declaratory judgment that Plaintiff Vest has freedom to practice and that the Company has covenanted not to sue Plaintiff Vest under any of the Company's intellectual property with respect to "Sugar Cubes" or related designs utilizing materials substantially as disclosed by Plaintiff Vest to the Company.

### FOURTH CAUSE OF ACTION
**Fraud (Promise Made Without Intention of Performing)**
**(Cal. Civ. Code §1572(4) §1709; §1710(4)))**
**(Against Defendant Green)**

77.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 76, inclusive, as if fully set forth herein.

78.     Plaintiff Vest had understood and trusted Defendant Green's many verbal and written representations starting in fall 2012, that Green and he were the initial co-founders of the Company, that they would share an equity allocation commensurate with principal founders serving pivotal business and development roles of a start-up organization, that both of them would enjoy and share the eventual financials rewards of their joint efforts in developing and launching the Company, that the bringing on of additional management team members and investors would be carefully undertaken to limit impact on their equity share positions, and that Defendant Green valued and viewed as essential Vest's contributions to the Company and their close working relationship.

79.     Upon information and belief, when Green made these statements and representations, Green new that they were false, or he was reckless in not knowing that they were false.  Green had no intention of sharing any part of the Company or Patents with Vest.

80.     Green made the statements and representations to Vest, intending that Vest rely on them and for the purpose of inducing Vest to develop and launching the Company and create the Patents.

81.     Plaintiff Vest also believed and trusted, as a result of Green's numerous written and verbal representations to him and others, that Green understood the critical, and essential, role that Vest's experience in mechanical component design and integrating electronic components therein, as well as identifying and guiding development of related software systems.

82.     In particular, Green was aware that Vest was solely and directly responsible for the design of an efficient, functioning model of the Company's core commercial offerings (the Sugar Cubes) and for fabricating the initial hardware prototype at a cost significantly reduced from that of typical technology development products, due to Vest's proficiency in designing computer-assisted design visualization tools to aid the building process.

83.     For many years of Defendant Green and Vest's collaboration in forming the Company, Plaintiff had no reason to be suspicious of, or even to question, Defendant's representations; Vest reasonably relied on these representations.  Vest was unaware of, and could not have reasonably discovered, the falsity of Green's statements and representations at the time

they were made. Vest relied on these statements and representations, in developing the Company and the Patents. Had Vest known the true facts, he would not have developed the Company or the Patents. It was not until more than two years of Defendant Green's having failed to have drafted and delivered to Plaintiff the promised and contemplated founders' equity documents, combined with discovering that Defendant Green gave the directions to the Company's patent agent to remove Vest's name from the non-provisional Patent application and failed to disclose this to Vest, that it became clear to Plaintiff Vest that Defendant Green had no genuine intention of ever fairly compensating Vest for his numerous Company contributions with his long-agreed co-founders share of equity, nor provide Vest with the public acknowledgement, and attendant rights, of his name being listed as an inventor of the Patents.

84.     Until discovering that his name had been omitted from the Patents in or about August 2017, Vest was unaware of Defendant Green's undisclosed intentions to his exploit Vest's contributions without compensating him as a founder nor acknowledging him accurately as an inventor of the Patents, Vest had reasonably relied on Defendant Green's assurances to the contrary in devoting several years of full working tine to the Company.

85.     Vest even forewent, for many periods of time, the regular monthly compensation Defendant Green had initially agreed to pay him during the development of the Lighting Product, in order that all of the Company's financial resources could be devoted to product development, and declined other paid work opportunities, following the representations by Green that when the Company achieved commercial success, Vest would be assured a founder-level equity position, together with the accompanying rights and remuneration.

86.     Plaintiff would not have undertaken several years of devoted service to the Company as he has done, and provided it with the highly-specialized technology innovations that he created, had it not been for Defendant Green's fraudulent promises designed to mislead Plaintiff Vest as to Defendant Green's true intentions of depriving Plaintiff of his founders' equity share in the Company and the credit and recognition of being named an inventor on the Patents and to exploit his technology inventions without due credit and compensation owed to Plaintiff, for the sole benefit of the Company and Defendant Green, at Plaintiff's expense.

87.     Plaintiff's reliance as aforesaid was justified by his reasonable trust in the sincerity of Defendant Green's numerous verbal and written agreements that he would perform his promises of treating Vestas a co-founder for equity and other compensation purposes, as well as treat him fairly and with candor.

88.     As a result of Defendant's fraud, Plaintiff was damaged by having been deprived of his rightful founder's equity share in Company' current commercial success, having been omitted from the Patents, and thereby left with no choice other than to undertake a formal legal process to assert and enforce his rights as a founder and inventor of Company's products.

89.     Plaintiff is thereby entitled to general and special damages, in an amount to be proven at trial, in order to compensate for losses caused by Defendant Green's fraud.

90.     As alleged above, Green's actions in misleading Plaintiff with such promises, were undertaken with the intent to defraud Plaintiff and deprive him of the compensation and credit due and promised him as a co-founder and technology inventor of the Company.  Green acted with malice, oppression, and/or fraud. Accordingly, Plaintiff is entitled to an award of punitive and exemplary damages against Green, in an amount according to proof at trial, sufficient to punish Green for the conduct that harmed Vest and to discourage similar conduct in the future.

### FIFTH CAUSE OF ACTION
**Fraud (Suppression of Facts by Willful Omission of Known Inventor from a Patent and Fraudulent Concealment of Such Omission)**
**(Cal. Civ. Code §1572(3); §1709; §1710(3))**
**(Against Defendant Green)**

91.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 90, inclusive, as if fully set forth herein.

92.     It is undisputed by the Company that Defendant Green gave directions to the Company's patent agent to remove Plaintiff's name from the non-provisional patent application filed in or about February 2018, and failed to disclose this to Vest, at that time, or at any future time.

93.     Defendant Green was aware the Plaintiff had originally described auto-mapping approaches for the "Sugar Cubes" at the inception of their working relationship, drawing from his engineering and electronics background.

**COMPLAINT**

94.     As the Company's President, Defendant Green approved the hiring of its patent agent, and oversaw and directed such agent's services in preparing both the provisional and non-provisional patent applications for the Patents.

95.     Defendant Green's actions in withholding from Plaintiff his decision to remove Plaintiff's name as an inventor from said patent application, and not providing even the courtesy of a notice that the non-provisional patent application had been filed without Plaintiff's name listed, were undertaken with a purposeful intent to deprive Plaintiff of due credit and recognition of being an inventor on the Patents.

96.     At the time of Defendant Green's unilateral and unjustified decision to remove Plaintiff's name from the list of inventors on the Patents, Defendant Green was aware that Plaintiff had ceased working regularly at the Company, pending receipt of the long-agreement memorializing the long-promised founder participation agreement.

97.     Plaintiff had so departed without executing any written assignments to the Company of intellectual property that he had developed or co-developed for the Company.  These circumstances may have formed sufficient incentive for Green to secretly remove Plaintiff's name from the patent application for the Patents, so that Plaintiff would have to take affirmative legal action later to prove his inventorship and status as a co-owner of the rights in and to such Patents.

98.     Defendant Green's failure to both include Plaintiff as an inventor on the Patents and to apprise Plaintiff of this fact were intentionally undertaken, creating a false public record of inventorship in the USPTO records concerning the Patents, given that Defendant Green knew of Plaintiff's substantial contributions to the Patents, as well as to deprive Plaintiff of his due credit, rights, and related compensation to which an owner and inventor of a Patents is entitled.

99.     Plaintiff is therefore entitled to general and special damages, in an amount according to proof at trial, in order to compensate for his losses caused by Defendant Green's willful suppression of the true facts of Plaintiff's co-inventorship of the Patents.

100.     Defendant Green's suppression of the fact that he had directed the removal of Plaintiff's name as an inventor on the Patents was an act of deliberate and purposeful intent, undertaken to benefit the Company at the expense of Plaintiff.  Accordingly, Plaintiff is entitled to

an award of punitive and exemplary damages against Defendant Green, in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

**Fraud (Intentional Non-Disclosure of Material Facts by a Fiduciary)**
**(Cal. Civ. Code §1572(3); §1709; §1710(3))**
**(Against Defendant Green)**

101.  Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 100, inclusive, as if fully set forth herein.

102.  As Company's President, Plaintiff's co-founder, and Plaintiff's co-member of the Company's founding board of directors, Defendant Green held the status of a fiduciary to both Company and the Company's other officers and directors, including Plaintiff.

103.  A fiduciary's duty of due care and loyalty is inconsistent with deliberately depriving Plaintiff of the public recognition and economic benefit of being truthfully named as an inventor on the Patents, and then purposefully withholding such omission from Plaintiff, in order to benefit the Company at Plaintiff's expense, as Defendant Green did.

104.  As a named inventor  on the Patents, and as Company's principal, Defendant Green gained an advantage over Plaintiff, by reason of his trust due to his status as his fiduciary, by not apprising him of Plaintiff's omission from the Patents and knowing that Plaintiff would not check the filing submitted for the non-provisional patent applications for the Patents, but simply trust, as he did, that that it would be filed with the same accurate list of inventors, including Plaintiff's name, as the non-provisional patent application contained.

105.  Plaintiff is entitled to general and special damages to compensate for losses caused by Defendant Green's willful fraud in this deception conduct intended to confer benefits on the Company and himself at Plaintiff's expense, as well as exemplary and punitive damages, in respective amounts according to proof at trial.

## SEVENTH CAUSE OF ACTION

**Constructive Fraud**
**(Cal. Civ. Code §1573; §1709; §1710(3))**
**(Against Defendant Green)**

106.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 105, inclusive, as if fully set forth herein.

107.    As the Company's President, Plaintiff's co-founder, and Plaintiff's co-member of the Company's founding board of directors, Defendant Green held the status of a fiduciary to both Company and the Company's other officers and directors, including Plaintiff.

108.    A fiduciary's duty of due care and loyalty is inconsistent with depriving Plaintiff of the public recognition and economic benefit of being truthfully named as an inventor on the Patent, and then withholding such omission from Plaintiff, in order to benefit the Company at Plaintiff's expense, as Defendant Green did, regardless of his specific intention in doing so.

109.    As a named inventor  on the Patents, and as Company's principal, Defendant Green gained an advantage over Plaintiff, by reason of his trust due to his status as his fiduciary, by not apprising him of Plaintiff's omission from the Patents and knowing that Plaintiff would not check the Company's filing submitted for the non-provisional patent application, but simply trust, as he did, that that it would be filed with the same accurate list of inventors, that included Plaintiff's name, as the non-provisional patent application had reflected.

110.    Plaintiff is entitled to general and special damages to compensate for losses caused by Defendant Green's conduct, regardless of his intent, that deprived Plaintiff, with whom Defendant Green has a fiduciary relationship, of his rights as an inventor of the Patents, conferring benefits on the Company and himself to Plaintiff's detriment, as well as exemplary and punitive damages, in respective amounts according to proof at trial.

**EIGHTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Cal. Civ. Code §1709, 1710(2))**
**(Against Defendant Green)**

111.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 110, inclusive, as if fully set forth herein.

112.    Plaintiff Vest had understood and trusted, for more than four years of Defendant Green's many verbal and written representations to this effect starting in fall 2012, that Defendant Green and he were the initial co-founders of the Company, that they would share an equity

allocation commensurate with principal founders serving pivotal business and development roles of a start-up organization, that both of them would enjoy and share the eventual financials rewards of their joint efforts in developing and launching the Company, that the bringing on of additional management team members and investors would be carefully undertaken to limit impact on Defendant Green and Vest's equity share positions, and that Defendant Green valued and viewed as essential Vest's contributions to the Company and their close working relationship.

113.    Defendant Green was negligent in making such statements to Plaintiff, because Plaintiff relied thereon in his continuing services to the Company for many years without ever receiving his promised founder's share of equity, nor other acknowledgement and payment for his services to which he was entitled.

114.    Until discovering that his name had been omitted from the Patents in or about August 2017, Vest was unaware of Defendant Green's undisclosed intentions to exploit Vest's contributions without compensating him as a founder nor acknowledging him accurately as an inventor of the Patents, Vest had reasonably relied on Defendant Green's assurances to the contrary in devoting several years of full working tine to the Company and foregoing opportunities for paid engagements during this time, including during periods when the Company failed to pay Plaintiff at all.

115.    Plaintiff relied on the truth of Defendant Green's representations as aforesaid to his detriment.  Plaintiff is therefore entitled to an award of punitive and exemplary damages against Defendant Green, in an amount according to proof at trial.

**NINTH CAUSE OF ACTION**
Breach of Fiduciary Duty
(Against Defendant Green)

116.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 115, inclusive, as if fully set forth herein.

117.     A fiduciary duty arises when one party either knowingly undertakes to act on behalf and for the benefit of another, or enters into a relationship which imposes that undertaking as a matter of law, such as a joint venture, a partnership, or an agency. As described herein,  Green and Vest engaged in a purposeful, mutual collaboration from 2012 to 2017 to develop and launch

the Company, grounded in the trust and respect that Vest had for Green, and amid verbal and written reassurances that the Company would be founded, launched, and operated in a way to provide economic benefit to both Green and Vest, and to be carried out with each having a right of joint participation in the management and control of the Company.

118.   Both joint ventures and partnerships carry expectations, pursuant to law, that Green would exercise a fiduciary level of loyalty and care in handling the Company itself, and in engaging with Vest, as his co-venturer and/or partner.

119.    Therefore, Vest is legally entitled to his proximate damages arising from  Green's breaches of his fiduciary duties owed Vest, as his partner or co-venturer.

**TENTH CAUSE OF ACTION**
**<u>Breach of Contract/Implied Contract to Form a Joint Venture or Partnership</u>**
**Cal. Civ. Code § 3300, Cal. Corps. Code § 16101(9)), § 16101(10), §16202(a)**
**(Against Defendant Green)**

120.   Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 119, inclusive, as if fully set forth herein.

121.   Green and Vest agreed to form the Company for their mutual benefit and to operate it as co-founders, and Vest incurred substantial time and development investment.

122.   Vest's working relationship with Green, in the absence of a formal written agreement specifying all specific terms of such relationship, gives rise to a potential finding that an implied-in-fact partnership between them was formed.

123.   An implied-in-fact partnership is evidenced by (*inter alia*) the verbal and written promises of fair treatment and lucrative outcomes made by Green, the reliance thereon that caused Vest to initially not insist on legal documentation to memorialize such promises, Vest's nearly two (2) years' work investment, often at reduced or no pay, and his performing diverse roles consistent with a founder and manager of a startup company. Consistent with such legal partnership being formed between Defendant Green and Vest, the former is charged with the heightened duties of a fiduciary, and liable for breaches of that duty to Vest.

124.   Vest's work for, and dedication to, the Company over several years is undisputed. He forewent other work engagements, in order to give priority to the numerous management and

technology development tasks that he performed for the Company, incurring detriment, *inter alia*, by declining to take other paying jobs in order to work exclusively for the Company.  Vest provided operational, administrative, and technology support, and was an officer, director, and active leader of the Company at all times relevant to allegations of this Complaint.

125.    Yet after more than two (2) years of requests, Mr. Green's promises to prepare an appropriate written agreement, and his promises to cause the Company to issue stock certificates evidencing his founders' share of equity, in order to recognize and compensate him formally for Vest's myriad contributions, have not been fulfilled.

126.    Vest has been damaged significantly by the aforesaid circumstances economically, including (by way of example only), his working for reduced or no pay, and foregoing other business opportunities in order to develop and manage the Company for over two (2) years.

127.    Plaintiff is therefore entitled to general and special damages, in an amount according to proof at trial.

## ELEVENTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
(Against Defendant Green)

128.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 127, inclusive, as if fully set forth herein.

129.    California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California, which requires that each party refrain from any conduct that impairs the value of the benefits to the other party pursuant to their contract, and to perform all acts required of them under the contract.

130.    Despite his trust and good efforts for the Company's benefit, as well as his diligent preparation of core intellectual property materials for the Company, Vest's name was omitted from the Company's non-provisional patent filing, in a deliberate effort to foreclose his being credited as an inventor thereon.  The very circumstances by which Vest's name was omitted without even the courtesy of notice to him prior to the Company's filing of the non-provisional patent application, speaks to the high level of discretionary power that Green exercised over the Company, relative to that of Vest.  It appears that Green purposefully exercised such power in a

1  manner intended to deprive Vest rightful recognition of his research and development

2  contributions to the Company.

3          131.    Plaintiff is entitled to general and special damages, in an amount according to proof

4  at trial, to compensate for his losses caused by Defendant Green's disingenuous promises, material

5  and bad faith omission of Plaintiff from the Patents, and other conduct wholly inconsistent with

6  the implied covenant of good faith and fair dealing imposed thereon.

7          WHEREFORE, Plaintiff respectfully requests the following relief:

8                                            **PRAYER**

9      1.  For an order correcting the inventorship listed on the Patents to include Plaintiff's

10         name;

11     2.  For a declaration that Plaintiff is a co-owner of the Patents, along with Company;

12     3.  For a declaration that Plaintiff is entitled solely to the ownership and use of all

13         hardware and software components designed by him for wearable technology

14         enhancements of the Company's lighting installations, and all other rights in and

15         thereto;

16     4.  For compensatory damages in an amount according to proof;

17     5.  For general and special damages in an amount according to proof;

18     6.  For punitive and exemplary damages in an amount according to proof;

19     7.  For an order awarding Plaintiffs the costs of suit of this action, including the fees and

20         costs of experts, together with reasonable attorneys' fees; and

21     8.  For such other relief that the Court considers just and proper.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2

Plaintiff hereby demands a jury trial pursuant to Fed. Rules Civ. Proc., rule 38(a) and

3

38(b).

4

5

DATED:  November 12, 2019                    HOGE, FENTON, JONES & APPEL, INC.

6

                                                        By:  _____/s/_____

7

                                                               Shella Deen
                                                               Attorneys for Plaintiff

8

                                                               BRUCE THOMAS VEST III

9

DATED:  November 12, 2019                    LAW OFFICES OF NANCY L. McCULLOUGH

10

11

                                                        By:  _____/s/_____

12

                                                               Nancy L. McCullough
                                                               Attorneys for Plaintiff

13

                                                               BRUCE THOMAS VEST III

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**